STEPHENS *v.* STATE.

Opinion delivered December 20, 1926.

1. HUSBAND AND WIFE—DESERTION OF WIFE—EVIDENCE.—Evidence *held* to sustain a verdict finding defendant guilty of wife desertion, under Crawford & Moses' Dig., § 2596, as amended by Acts 1923, No. 331.

2. HUSBAND AND WIFE—DESERTION OF WIFE—JURY QUESTION.—Where testimony as to whether there had been willful abandonment and refusal to support defendant's wife was conflicting, the weight of the evidence was for the jury.

3. HUSBAND AND WIFE—DESERTION OF WIFE—INSTRUCTION.—An instruction that a husband has a right to select a home for himself and family, and that, if defendant provided a home with his parents for his wife while he solicited insurance elsewhere and provided for his wife as well as his station in life would reason-

ably permit, was properly refused where it was abstract, argumentative and misleading.

Appeal from Howard Circuit Court; *B. E. Isbell,* Judge; affirmed.

*Steve Carrigan* and *Feazel & Steel,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. The appellant was tried and convicted in the Howard Circuit Court on an indictment which, in apt language, charged him with the crime of wife desertion, under § 2596 of C. & M. Digest, as amended by act 336 of the Acts of 1923. The facts are substantially as follows:

Mrs. Hershell Stephens testified that she married the appellant on the 25th of April, 1924, when she was fifteen years old. They went immediately to the home of appellant's parents at Mineral Springs, Howard County, Arkansas, and had lived there until the day before the indictment was returned against appellant, which was the 27th day of August, 1926. For about eight months past the appellant had been living at El Dorado, and was engaged in the business of writing insurance. During that time he had contributed about $15 to witness for herself. He sent her $10 before her baby came, in addition, and gave her money to buy things for the baby. Witness went to Magnolia, and advised the appellant over the telephone, on Saturday prior to the separation on Sunday, that she had come there to go to El Dorado with him. Appellant said she could not go; that it was too expensive. Witness told him that he would have to rent her a room then, and he said he would not. They came on back to Mineral Springs together, and, when they got there, appellant said, "I have decided while we are young we will quit. I am fixing for the child $12.50 a month, and as he grows older I will increase it." Appellant did not propose to leave witness anything. When they got back to Mineral Springs, appellant put witness out at the hotel. She had no money. Appellant told witness that he was not

going to live with her any longer. He asked witness if there was anything she wanted from the house. Witness told him there were some clothes. Appellant told witness to go up next morning and get her things. Witness went, but did not get anything. She did not see appellant any more after that. She heard he went back to El Dorado. Appellant had bought witness, since their marriage, two nice dresses. Witness purchased the clothing she had on, and had them charged to the appellant at Magnolia. Appellant had bought her six dresses since they were married. Appellant came home recently with a check for $700, and witness didn't know how much more. That was about a week before the separation. Appellant had been paying $25 for his meals and $20 for his room and laundry bill. They were married in Howard County, something over two years ago, and appellant left witness at Mineral Springs. Witness had been trading on appellant's account, before the separation, at Dickinson & Brother's. Witness did not know whether appellant had stopped her accounts anywhere since the separation or not. Witness and appellant lived with the appellant's parents as members of the family. Appellant had taken out two insurance policies on his life, while appellant and witness were living together, for witness' benefit. Of the $700 that appellant brought home with him at one time, $400 belonged to the insurance company. Witness didn't know what became of the other $300. Appellant paid a few bills at Mineral Springs. He stated that he paid $75 on a note. Appellant and witness had not had any falling out, any more than any other young people. Witness had not quit loving the appellant. Their relations while they were at appellant's father's house for a while were pleasant. At the time her husband left her there they were not pleasant. That was one of the reasons witness wished to move. Their little boy was six months old.

Mrs. Ward testified that she was acquainted with the appellant and his wife. Appellant is witness' nephew. Witness kept a hotel in Mineral Springs.

Appellant and his wife came to the hotel last Sunday, about six o'clock in the afternoon, and appellant left his wife there. He came back, and they went off together and were gone about twenty or thirty minutes, and again came back, and the last time appellant didn't stay. When Mrs. Stephens came in the house she was crying. Witness was asked if she heard the defendant, at any time, say he didn't intend to live with his wife—that he would go to the penitentiary before he would do it. Witness answered, ''Well, he just stated before he would live with her he would—he made that remark.'' This conversation was after the indictment was lodged against appellant. Witness told appellant he had better compromise with his wife—that he might have to go to the penitentiary, and, in reply, he said that he would go to the penitentiary before he would do it.

Mrs. C. C. Stephens, another aunt of appellant, testified to a conversation she had recently with the appellant as follows: He was at the hotel, and was talking about this, and I asked him why he didn't compromise, and he said he didn't think he could. I told him I believed he could. I said that might be the best for you if you would, or give her alimony. He said, ''Aunt Pearl, I will just go to the pen before I will do that.'' This conversation with appellant was after he had been indicted and arrested. Witness was advising him as his aunt. He told witness that he would go to the pen before he would pay alimony. It was shown by appellant's father that appellant and his wife had lived with witness since they were married. Appellant had paid part of the grocery bills. There were six in the family when appellant and his wife were there. Appellant and his wife had rooms to themselves. Appellant's wife came up with a truck Monday morning and moved her stuff away. The appellant had come in Sunday night before and said that he had left his wife and boy at a hotel in Magnolia. Appellant was working in El Dorado in the insurance business, and when he left he left some money for his wife. Witness treated appellant's wife like she was one

of his children. They lived there together peaceably and happily. Witness didn't know that there was any trouble between appellant and his wife.

Appellant's mother testified that she and appellant's wife lived together happily. They both did housework. Appellant treated his wife kindly. He was working in the oil fields, and would come home week-ends.

Other witnesses, not members of the family, testified to the effect that the appellant and his wife lived happily, so far as they could observe, in the home of appellant's father and mother.

Appellant himself testified that he did not desert his wife. She called him at El Dorado, and told him that she was going to Magnolia, and he replied, "I will meet you there, sweetheart." Appellant met his wife and baby at Magnolia, and saw she was mad. She refused to eat any dinner, and said that she didn't intend to return to Mineral Springs. Appellant explained to her that he had no money—was just getting started—and that, if she would help him a little while longer, they would move to El Dorado. She replied that she was going to place their baby in the orphans' home and she was going to Dallas. She asked appellant to get a divorce, and he told her he would not do so; that she could get it. She offered him their wedding ring, and he refused to take it. Appellant explained that he had received the $700 check in payment of the premium on the insurance policy and the disposition he made of it, paying $446 of it to the company and using the balance in the payment of bills contracted by himself and wife. Appellant had never refused to support his wife. He felt hurt because she had indicted him while she was mad. He loved his wife and baby, and has never refused to support them. He denied that he had stated to her that they had better quit. Appellant had been making from fifty to a hundred dollars a month, but was then doing better. Appellant had attempted to talk with his wife since the indictment, but she had refused, saying that she would send him some "Chesterfields" at the Tucker farm.

The appellant's wife, in rebuttal, testified, denying that she told her husband she was going to quit him. She stated that she had told him that she would send him a package of cigarettes if he was sent to the penitentiary. There was other testimony to the effect that the appellant was doing fairly well in the insurance business at El Dorado.

The appellant presented the following prayer for instruction, which the court refused to grant:

"A. You are told that the husband is regarded in law as being the head of the family, and has a right to select the domicile of himself and family. Therefore, if you find from the testimony that the defendant in this case has provided a home with his parents for his wife, while he solicited insurance in other parts of the State, and that he did not desert his wife, but, on the other hand, was providing for his wife as well as his station in life would reasonably permit, you will find him not guilty."

The appellant duly excepted to the ruling of the court in refusing the above prayer. The jury returned a verdict of guilty, fixing the appellant's punishment at a fine of $500 and imprisonment in the county jail for thirty days. The court rendered judgment in accordance with the verdict, from which is this appeal.

1. The appellant contends that there was no testimony to sustain the verdict. All the material testimony is set forth above, and it tends to prove that the appellant refused to take his wife to El Dorado with him to live, at her request, claiming that he was not financially able to maintain her there and that he would do so as soon as he was able. Her testimony tends to show that, a short time before the indictment was lodged, he and his wife met in Magnolia, and she there requested him to take her to El Dorado with him, but, instead, he took her to Mineral Springs and left her at the hotel, saying that they would quit while they were young. He proposed to make some provision for their baby but none for his wife. The appellant had left $12.50 with his father for

his wife, when he returned to El Dorado from his last visit, and appellant's father gave her a check for this amount, three or four days after the indictment was returned against appellant.

The aunts of appellant, after the indictment was preferred, interposed their kindly offices to effect, if possible, a reconciliation between appellant and his wife and counseled him to compromise, stating that the prosecution might result in his imprisonment in the State Penitentiary. Whereupon, to this admonition he replied, in substance, that he would go to the penitentiary before he would live with his wife.

In the recent case of *Lindell* v. *State,* 129 Ark. 36, 195 S. W. 382, the court, having under consideration a case of abandonment and nonsupport of wife and child under our statute, in commenting upon the testimony, said: "There is a sharp conflict in the testimony as to whether or not there was * * * a willful abandonment and refusal to support, but the weight of the evidence was a matter within the province of the jury, and we cannot say that there was not enough evidence to support the verdict." That declaration is applicable also to the facts of this record. See also *Miller* v. *State,* 123 Ark. 481, 185 S. W. 789; *Dempsey* v. *State,* 108 Ark. 76, 157 S. W. 734.

2. The court did not err in refusing to grant appellant's prayer for instruction No. A, set out above. The instruction gave undue prominence to the fact that appellant had provided a home with his parents for his wife and child, and was tantamount to telling the jury that, if he did this, he was not guilty of desertion. At least the jury might have so inferred. While as an abstract proposition the husband has the right to select the domicile for himself and family, nevertheless such an instruction, under a charge of this kind, is abstract and misleading, because it conveys the necessary inference that a married man has the absolute right to select the home of his parents as the domicile for himself and family and compel his wife and children to live there. Whether he has such right would depend wholly upon the circum-

stances. Since the prayer for instruction is abstract, argumentative and misleading, the trial court ruled correctly in refusing to grant the same.

There is no error in the record, and the judgment is therefore affirmed.